Receipt #6029666

ORIGINAL

FILED
JUN 2 2005
U.S. COURT OF FEDERAL CLAIMS

ECF

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| Government Telecommunications, Inc.<br>4500 Southgate Place, Suite 300<br>Chantilly, Virginia 20151,<br><br>Plaintiff,<br><br>v.<br><br>The United States,<br><br>Defendant. | ) | No. 05- 592C |

## COMPLAINT

COMES NOW the Plaintiff, Government Telecommunications, Inc. (GTI), by counsel, and hereby asserts the following for its Complaint against the Defendant, the United States, acting through and by the United States Postal Service (USPS or Postal Service), and states as follows:

## JURISDICTION

1. This Court has jurisdiction over this matter pursuant to the Tucker Act, 28 U.S.C. § 1491. GTI brings this action pursuant to the Contract Disputes Act of 1978, 41 U.S.C. § 601 *et seq.* (CDA).

2. Pursuant to the CDA, 41 U.S.C. § 609, GTI brings this action directly to the United States Court of Federal Claims within 12 months of the imputed "deemed denied" date of the Contracting Officer's Final Decision.

## PARTIES

3. The Plaintiff, GTI, is a corporation organized and existing under the laws of the Commonwealth of Virginia, with its principal place of business in Chantilly, Virginia. Among

other things, GTI contracts with various United States governmental agencies, including the Postal Service, for the design and installation of electrical and telecommunication equipment infrastructure. One of GTI's specialties is the performance of such installation on multiple, geographically diverse, locations. GTI is a wholly owned subsidiary of Computer Equity Corporation. Computer Equity Corporation is a wholly owned subsidiary of Applied Digital Solutions, Inc., headquartered in Delray Beach, Florida.

4. The Defendant is the United States, acting through its agency, instrumentality, and/or agent, the Postal Service.

## NATURE AND SUMMARY OF ACTION

5. This action is brought by GTI pursuant to the provisions of the CDA, 41 U.S.C. § 609, seeking recovery against the government for the increased costs of additional project site complexities encountered in the performance of Mail Processing Infrastructure (MPI) work under Contract No. 3AAERD-03-P-6080 (the Contract) with the Postal Service. USPS directed GTI to bid all sites as if they were "Merrifield-like," *i.e.*, non-complex sites. In actuality, the work environment at a number of these sites proved to be far more complex than the "Merrifield-like" baseline that GTI was told to assume when preparing its pricing for the MPI work. For the most part, this added complexity manifested itself in inefficiencies and delays at these sites. The work was rendered less efficient because it became more labor intensive; *i.e.*, more units of labor input were required to obtain the same level of production output. In each case, GTI overcame these inefficiencies and delays by adding personnel and by accelerating the schedule such that the work ultimately was completed on or ahead of schedule. As a result, the Contract Line Item Number (CLIN) unit pricing based on Merrifield-like conditions no longer fully captured the labor cost upon the extension of that pricing over the actual quantities at the affected sites. GTI's

right to recover is particularly compelling here, as USPS acknowledged the concept of site-specific complexity and even represented to GTI that it would discuss making complexity-related adjustments following Contract award, but then, without justification or explanation, failed to follow through on this representation. This action is supported by a number of independent, but complementary, legal theories, including: (a) equitable estoppel; (b) constructive change; and (c) defective specification. The total amount claimed by GTI in this action is $756,946, plus interest as allowed under the CDA.

6. This action is related to Civil Action Nos. 05-463C, 05-491C and 05-547C, which were filed by GTI on April 11, April 22, and May 13, 2005, respectively.

## STATEMENT OF FACTS

*Contract Award and Overview*

7. On April 7, 2003, the USPS issued RFP 3AAERD-03-A-1200, accompanied by a statement of work (SOW). According to the SOW, the scope of work for the MPI program included pre-installation, installation, and post-installation activities necessary for successful structured wiring implementation.

8. Proposals were initially submitted on May 5, 2003. On June 4, 2003, GTI was notified by the Postal Service that it was one of the finalists for award. On June 20, 2003, the Postal Service notified all bidders that the award of the MPI Contract had been made to GTI.

9. GTI experienced a number of occasions during the course of performance where it incurred additional costs due solely to the actions, inactions, or decisions of the Postal Service and for which GTI, pursuant to the terms of the Contract or otherwise, is entitled to an upward adjustment in Contract price. One of these categories for which GTI is entitled to recover is for

the increased costs of additional site complexities encountered by GTI in the performance of work under the Contract, as discussed below.

*Facts Giving Rise to the Cause of Action*

10. During a meeting between the parties on June 6, 2003, prior to Contract award, GTI proposed to USPS that the parties utilize a short-form complexity checklist to gauge a site's relative complexity. That checklist consisted of a one-half page outline that classified sites as "Standard," "Complex," or "Very Complex."

11. Instead of rating the sites for complexity level as the short-form complexity checklist would have allowed for, the Postal Service directed GTI to base its pricing for all sites as if they reflected "Merrifield-like" complexity, and then assured GTI that it would discuss making complexity-related adjustments following contract award. That directive was ordered by Tom Fallon, USPS Purchasing Specialist, at the June 6, 2003 meeting and witnessed by several other USPS employees, including Linda Hunt and Larry Sackett.

12. The term "Merrifield-like" complexity means that level of complexity as exhibited by the Merrifield, Virginia USPS site. Additionally, all parties using the term "Merrifield-like" complexity understood the term to refer to USPS sites that were ordinary, non-complex sites that presented no special problems to be overcome during the MPI installation process.

13. At the Merrifield site, all Mail Processing Equipment (MPE) was on one floor. This allowed for a simple and straightforward approach to the routing of conduit and the placement of cabling. Additionally, the Merrifield site consisted of one workroom in a single contiguous building. Merrifield also is sited in a Zone 1 seismic location, which means that no special earthquake-related code requirements applied to the structural design.

14. Other baseline structural conditions existing at the Merrifield site included a relatively low ceiling height (20 to 23 feet) and "I"-beam ceiling supports and columns. These conditions allowed for the use of routine installation procedures such as the utilization of beam clamps for conduit supports and the welding of cabinet support platforms to the columns.

15. Further, there were few overhead obstructions at Merrifield and the aisles between and among the MPE at Merrifield generally were wide enough to allow for the movement and set-up of standard platform lifts needed to install the conduit system.

16. In response to the USPS directive described in paragraph 12 above, GTI priced its Contract Line Item Numbers (CLINs) as if all USPS sites exhibited Merrifield-like complexity. In doing so, GTI relied on the Postal Service's representations of a post-award negotiation also described in paragraph 12 above to implement complexity adjustments. Following contract award, however, GTI approached USPS to negotiate these complexity adjustments, but USPS refused to negotiate and even denied that the conversation ever took place.

17. GTI performed work at a number of sites that were more complex than Merrifield, and, as a result, experienced delays, inefficiencies, and other additional costs that it would not have incurred had those sites exhibited "Merrifield-like" levels of complexity.

*Increased Costs due to Additional Complexity*

18. GTI captures the increased costs caused by the additional complexity using two approaches. The first approach is to qualitatively compare several representative complex sites with "Merrifield-like" site conditions to determine the nature of the additional work and the more labor-intensive working conditions presented by the more complex sites. That exercise establishes the fact of damage and defines the general parameters of the types of the additional costs incurred.

19. The second approach is to screen the Phase I and Phase IIa sites for complexity, normalize the data for those sites that are deemed to be complex, and determine the incremental cost of those complex sites over the baseline Merrifield-like conditions.

20. In order to qualitatively describe and contrast the more labor-intensive working conditions existing at the complex sites, GTI compares the conditions existing at three representative "complex" sites with the conditions existing at Merrifield. These representative "complex" sites include: (a) Minneapolis; (b) Dominic V. Daniels; and (c) Fort Lauderdale.

21. The Minneapolis facility presented a number of site-specific characteristics that increased the MPI installation costs, including MPE work located on three floors (as opposed to Merrifield's one-floor layout). Also at the Minneapolis site, GTI encountered increased pulling distances for fiber optic cabling that required GTI to man multiple cable pulling points.

22. Additionally, the ceiling structure at Minneapolis presented working conditions that were inherently more labor-intensive than at Merrifield in that portions of the facility included concrete ceiling beams, which meant that GTI had to drill concrete anchors for conduit supports rather than being able to simply clamp those supports to the "I"-beam flanges as was done at Merrifield. The square concrete columns present at the Minneapolis facility also required that GTI engineer and install specialized trapeze-type cabinet mounts. GTI had to perform some of its overhead work behind a suspended ceiling and had to negotiate with the Postal Service Inspection Service to route conduit through the lookout galleries, which were flush with the ceiling.

23. Just as with the Minneapolis facility, the Dominic V. Daniels (DVD) site featured MPE on multiple floors and required extensive cable pulling operations. In addition, DVD featured concrete ceiling beams, which, like the Minneapolis site, required that GTI hammer drill

holes for concrete anchors for all conduit / trapeze supports, which is significantly more labor intensive than attaching beam clamps to "I"-beams or trusses.

24. The round concrete columns at the DVD site also required that GTI employ specialized trapeze-type cabinet mounts, a procedure not required at the Merrifield site. The flared tops on these columns presented additional overhead attachment problems for the cabinet trapeze supports. Furthermore, the DVD site contained one of the most extensive Sack Sorting Systems ever encountered by GTI. This Sack Sorting System consisted of multiple conveyers that greatly impaired GTI's ability to install conduit in those areas.

25. The third representative complex facility chosen for illustration purposes here is the Fort Lauderdale facility. While the Fort Lauderdale site was "non-complex" with respect to the building structure itself (*i.e.*, Merrifield-like), other features of the site were complex. For example, the facility contained an extensive Tray Management System that covered more than 50% of the workroom floor area. The conveyers in the Tray Management System were located in the same areas of the ceiling as GTI's proposed conduit system design location. This interference forced a redesign of the conduit system and made conduit installation less efficient and more costly. Additionally, GTI encountered lead-based paint at the site and had to perform some unexpected relocation work.

26. Accordingly, as can be seen from the discussion above, complex sites presented characteristics not found in the baseline, "Merrifield-like" sites. These elements of complexity increased the amount of labor required in the MPI installation process by necessitating levels of effort (and cost) beyond what was required to do the same work in a "Merrifield-like" environment. This increased GTI's costs and rendered the affected CLINs at those sites inapt and obsolete.

27. In addition to the "bottom-up" approach to demonstrating the additional direct cost of complexity in the MPI work, GTI also has conducted a "top-down" analysis. This second approach employs the complexity "scorecard" questionnaire developed by GTI and adopted by USPS for Phase IIb to determine whether a site is Merrifield-like (*i.e.*, non-complex) or complex. The sites were grouped into cohorts (*e.g.*, Phase Ia, Phase Ib, and Phase IIa) to aid the analysis. The total subcontractor quote for each site was then divided by the number of zone boxes specified in the proposal for a given site to yield a common baseline of installation cost per zone box (denoted as variable "X").

28. The next step in the "top down" approach is to calculate the average cost per zone box for the Merrifield-like sites. In order to normalize the data, only Merrifield-like sites with an Escalation Factor of 1.00 were used in this computation. The additional amount owing to site complexity is calculated by comparing the installation cost per zone box for a specific complex site with the like value for the non-complex sites. In order to do this on an "apples-to-apples" basis, one must multiply the average cost per zone box ("X") by the Escalation Factor ("Y") assigned to each site.

29. To the extent that a complex site's actual installation cost per zone box is greater than "X" x "Y", then that difference represents the cost of complexity that was built into the subcontractor's price for that site that was not captured in GTI's non-complex CLINs. Multiplying the difference between the actual cost per zone box and "X" x "Y" times the number of zone boxes for each site yields the total additional subcontractor cost for complexity that is attributable to the site.

30. On January 13, 2005, GTI submitted to the Postal Service a Request for Equitable Adjustment (REA) seeking an amount of $756,946.

31. Despite GTI's multiple invitations to meet and discuss this REA, USPS failed and refused either to meet or discuss the matter.

32. Having reached a constructive impasse in the REA contract administration process, GTI on March 29, 2005 re-filed the REA as a claim under the CDA and formally requested a Contracting Officer's final decision thereon. Since that filing, more than 60 days has elapsed without the Contracting Officer's issuance of a final decision or a Contracting Officer's request for more time within which to issue a final decision. As such, GTI's certified claim on the REA issues is deemed denied. *See Dalton v. Cessna Aircraft Co.*, 98 F.3d 1298 (Fed. Cir. 1996).

## COUNT I

### Equitable Adjustment: USPS is Equitably Estopped from Denying that It Agreed to Make Post-Award Complexity Adjustments

33. Plaintiff re-alleges each of the allegations contained in paragraphs 1 through 32 as if fully set forth herein.

34. Estoppel is a concept that prohibits a party from escaping liability for statements, actions, or inactions if they have been relied upon by the other party. The first basis on which GTI is entitled to recover is that the Postal Service is equitably estopped from denying that it agreed to discuss making post-award complexity adjustments.

35. In a contract dispute, the requirements for estoppel traditionally have been: (a) the Government must know the true facts, (b) the Government must intend that its conduct be acted on . . . so that the contractor asserting the estoppel has a right to believe it so intended, (c) the contractor must be ignorant of the true facts, and (d) the contractor must rely on the Government's conduct to his injury. Additionally, the Government's act of inducing reliance

must constitute affirmative misconduct and the Government's representative must have been acting within the scope of his or her authority.

36. As pled in more detail above, the Postal Service directed GTI to base its pricing for all sites as if they reflected "Merrifield-like" levels of complexity and assured GTI that it would discuss making complexity-related adjustments following contract award.

37. GTI relied on this representation of a post-award negotiation to implement complexity adjustments and based its CLIN pricing assuming a Merrifield-like level of complexity. Following award, however, GTI approached USPS to negotiate these complexity adjustments, but USPS refused to negotiate and even denied that the conversation ever took place.

38. Accordingly, GTI satisfies the four *prima facie* elements for proving equitable estoppel as well as meets the additional criteria of affirmative misconduct by an authorized Government representative. Alternatively, courts have held that the Government cannot renege on a pre-award oral representation as to the reimbursability of certain costs, for to do so would be like authorizing government employees to set traps for unwary contractors.

39. The Postal Service has failed and refused to pay GTI any money in response to GTI's administrative REA and claim submission process predicated, *inter alia*, on the legal theory of equitable estoppel. As a direct and proximate result of USPS' wrongful failure to issue an equitable adjustment for $756,946, GTI has sustained damages in this amount.

40. GTI has exhausted its contractual and administrative remedies, has properly invoked the CDA dispute-resolution process, and is properly before the Court for decision on this claim.

WHEREFORE, GTI respectfully requests that the Court enter judgment against the Postal Service on Count I in the amount of $756,946, plus pre-judgment and post-judgment interest, attorneys' fees, costs, and such other relief as this Court deems appropriate.

## COUNT II

### Equitable Adjustment: Failure to Issue Equitable Adjustment for Additional Complexity Under the Constructive Change Doctrine

41. Plaintiff re-alleges each of the allegations contained in paragraphs 1 through 40 as if fully set forth herein.

42. Another basis for recovering additional complexity-related costs here is the constructive change doctrine. Clearly, where unit pricing based on "Merrifield-like" complexity (*i.e.*, non-complex) does not cover the costs of a more complex facility (due, for example, to multiple floors, high ceilings, overhead obstructions, and the like), then the unit pricing no longer is meaningful and the issuance of an equitable adjustment is in order.

43. The general rule under the constructive change doctrine is that where as a result of the Government's misinterpretation of contract provisions a contractor is required to perform more or different work, or to higher standards, not called for under its terms, the contractor is entitled to equitable adjustments pursuant to the "Changes" clause, including extensions of time.

44. USPS told GTI to bid all sites as if they were "Merrifield-like." In actuality, the work scope required that GTI perform work at a number of sites that were more complex than Merrifield, resulting in inefficiencies and other additional costs associated with a more labor-intensive environment that were not built into GTI's Merrifield-based unit pricing.

45. Accordingly, GTI is entitled to recover its increased costs of performance here under the constructive change doctrine.

46. The Postal Service has failed and refused to pay GTI any money in response to GTI's administrative REA and claim submission process predicated, *inter alia*, on the legal theory of constructive change. As a direct and proximate result of USPS' wrongful failure to issue an equitable adjustment for $756,946, GTI has sustained damages in this amount.

47. GTI has exhausted its contractual and administrative remedies, has properly invoked the CDA dispute-resolution process, and is properly before the Court for decision on this claim.

WHEREFORE, GTI respectfully requests, in the alternative to the relief requested in Count I, that the Court enter judgment against the Postal Service on Count II in the amount of $756,946, plus pre-judgment and post-judgment interest, attorneys' fees, costs, and such other relief as this Court deems appropriate.

## COUNT III

### Equitable Adjustment: Failure to Issue Equitable Adjustment for Additional Complexity Under the Defective Specification Doctrine

48. Plaintiff re-alleges each of the allegations contained in paragraphs 1 through 47 as if fully set forth herein.

49. As pled in more detail above, the Postal Service directed GTI to base its pricing for all sites as if they reflected "Merrifield-like" levels of complexity and assured GTI that it would discuss making complexity-related adjustments following contract award.

50. GTI relied on the Postal Service's representation of a post-award negotiation to implement complexity adjustments and based its CLIN pricing assuming a Merrifield-like level of complexity. Following award, however, GTI approached USPS to negotiate these complexity adjustments, but USPS refused to negotiate and even denied that the conversation ever took place.

51. The Postal Service's nondisclosure of the fact that it would not entertain post-award pricing adjustments to reflect added complexity at a number of the sites renders its specifications defective thereby entitling the contractor to an equitable adjustment to make it financially whole.

52. The Postal Service has failed and refused to pay GTI any money in response to GTI's administrative REA and claim submission process predicated, *inter alia*, on the legal theory of defective specification. As a direct and proximate result of USPS' wrongful failure to issue an equitable adjustment for $756,946, GTI has sustained damages in this amount.

53. GTI has exhausted its contractual and administrative remedies, has properly invoked the CDA dispute-resolution process, and is properly before the Court for decision on this claim.

WHEREFORE, GTI respectfully requests, in the alternative to the relief requested in Counts I and II, that the Court enter judgment against the Postal Service on Count III in the amount of $756,946, plus pre-judgment and post-judgment interest, attorneys' fees, costs, and such other relief as this Court deems appropriate.

## COUNT IV

### Breach of Contract: Failure to Issue an Equitable Adjustment and Modify the Contract for the Cost of Additional Complexity Under the Equitable Estoppel Doctrine

54. Plaintiff re-alleges each of the allegations contained in paragraphs 1 through 53 as if fully set forth herein.

55. Pursuant to the Contract and applicable law, the Postal Service had an obligation to issue to GTI an equitable adjustment and modify the Contract under the doctrine of equitable estoppel for the cost of additional complexity.

56. The Postal Service materially breached the Contract by failing to issue an equitable adjustment for the extra cost of additional complexity.

57. As a direct and proximate result of USPS' breach of Contract, GTI has sustained damages in the amount of $756,946.

58. GTI has exhausted its contractual and administrative remedies, has properly invoked the CDA dispute-resolution process, and is properly before the Court for decision on this claim.

WHEREFORE, GTI respectfully requests, in the alternative to the relief requested in Count I, that the Court enter judgment against the Postal Service on Count IV in the amount of $756,946, plus pre-judgment and post-judgment interest, attorneys' fees, costs, and such other relief as this Court deems appropriate.

## COUNT V

**Breach of Contract: Failure to Issue an Equitable Adjustment and Modify the Contract for the Cost of Additional Complexity Under the Constructive Change Doctrine**

59. Plaintiff re-alleges each of the allegations contained in paragraphs 1 through 58 as if fully set forth herein.

60. Pursuant to the Contract and applicable law, the Postal Service had an obligation to issue to GTI an equitable adjustment and modify the Contract under the constructive change doctrine for the cost of additional complexity.

61. The Postal Service materially breached the Contract by failing to issue an equitable adjustment for the extra cost of additional complexity.

62. As a direct and proximate result of USPS' breach of Contract, GTI has sustained damages in the amount of $756,946.

63. GTI has exhausted its contractual and administrative remedies, has properly invoked the CDA dispute-resolution process, and is properly before the Court for decision on this claim.

WHEREFORE, GTI respectfully requests, in the alternative to the relief requested in Count II, that the Court enter judgment against the Postal Service on Count V in the amount of $756,946, plus pre-judgment and post-judgment interest, attorneys' fees, costs, and such other relief as this Court deems appropriate.

## COUNT VI

### Breach of Contract: Failure to Issue an Equitable Adjustment and Modify the Contract for the Cost of Additional Complexity Under the Defective Specification Doctrine

64. Plaintiff re-alleges each of the allegations contained in paragraphs 1 through 63 as if fully set forth herein.

65. Pursuant to the Contract and applicable law, the Postal Service had an obligation to issue to GTI an equitable adjustment and modify the Contract under the defective specification doctrine for the cost of additional complexity.

66. The Postal Service materially breached the Contract by failing to issue an equitable adjustment for the extra cost of additional complexity.

67. As a direct and proximate result of USPS' breach of Contract, GTI has sustained damages in the amount of $756,946.

68. GTI has exhausted its contractual and administrative remedies, has properly invoked the CDA dispute-resolution process, and is properly before the Court for decision on this claim.

WHEREFORE, GTI respectfully requests, in the alternative to the relief requested in Count III, that the Court enter judgment against the Postal Service on Count VI in the amount of $756,946, plus pre-judgment and post-judgment interest, attorneys' fees, costs, and such other relief as this Court deems appropriate.

Dated: this 2nd day of June 2005.

Respectfully submitted,

**Government Telecommunications, Inc.**

By Counsel:

John C. Person, Esquire
PERSON & CRAVER LLP
1801 K Street, N.W.
Washington, D.C. 20006
(202) 466-4434 – phone
(202) 466-4416 – fax
jcperson@perscrav.com

Attorneys for Plaintiff

Of Counsel:

Michael Krawitz, Esq.
General Counsel, Applied Digital